All righty, welcome you here to the court this morning. We realize that one of you had a skiing accident. We'll just advise you about the fact that we have time limits so when you can see the yellow light, it means you have two minutes left in your argument and when the red light comes on, please conclude as expeditiously as possible unless you're answering a question from the court. We also appreciate citations to the record when those are appropriate. First case is number 1840318, Maldonado v. Rodriguez and we'll hear first from Mr. Thomas. Good morning, Your Honors. May it please the Court and Counsel, my name is Ray Thomas and I have the honor of representing the DA, Ricardo Rodriguez of Hidalgo County, Texas, a defendant in the trial court below. With the limited time that we have, I propose to focus on three points. One is the important role and special challenges that our elected prosecutors face and in particular this DA, DA Rodriguez. Then I'd like to move to the issue of whether a showing of potential for disruption is sufficient and then the third point is whether or not the law was clearly established as it applies to these terminations in 2015. Starting with the first point, the 2017 decision of the Fourth Court in Borzirelli v. Mosby cited in our brief is particularly instructive in describing the special role of our elected prosecutors. They say that the prosecutors have a broader public responsibility because they represent and safeguard the public at large. Their responsibilities are laden with ideological content. For example, how much of a prosecutor's resources will be devoted towards fighting different types of crime, public corruption or white collar crime or should it be focused on violent crime or drug trafficking? Questions like these are debated in prosecutorial campaigns across the country, leaving much room for political disagreement and carrying out priorities. Let me ask you a couple of preliminary questions. As I understand it, there were about 150 employees in the DA's office? Yes, Your Honor. And these seven, how many were fired? These seven filed a lawsuit but how many did he fire? The record says that over 90% were retained. I don't have the exact number of how many were fired but the record does say over 90% were retained. Okay. And what about the others? Were they all fired because he wanted his own crew, so to speak? The only ones that were let go, that were terminated, were those that had high level positions that he considered key to his success. High level positions, close advisors, what he would describe as his inner circle. Those were the only ones that he let go. There were some other attorneys who left on their own accord but those are the only ones that the record indicates that were terminated. And so, the Fourth Court goes on to say in this case that of course elections mean something, majorities bestow mandates, and these elected prosecutors have to translate the mandates into policies. It is therefore entirely proper for a newly elected DA to assess whether he or she has the trust and confidence in those who are around them to carry out these priorities and help them achieve their goals, the mandate that they received when they were elected. Some candidates like DA Rodriguez gain office by promising change in current policy and it may often be the case that those who served in the past regime are entrenched and resistant to change. And so, to entrench former policy makers in their positions, the Fourth Court says, may deprive democratic politics of necessary change. So taking into account the environment our DA Rodriguez found when he took office on January 1, 2015, the citizens of Hidalgo County gave him a mandate to restore integrity to the law enforcement in Hidalgo County. And all of that is fine but we're getting down to the individuals that were terminated. Yes, sir. And the question is whether they're not disputed issues of material fact with respect to those individuals. You are contending that a lot of them were policy makers, that they had serious responsibilities, but they denied. They said, no, that is not right, we were not. And they have witnesses that say, no, we were not. So all of them, all of the, I mean, the seven, and it seems like a disputed issue of material fact with respect to all of them. And if that's true, we don't have jurisdiction here on the appeal of qualified immunity. Well, your Honor, with respect to the disputed factual issues, I would agree that this Court does not have jurisdiction to re-weigh the disputed evidence from the Court below. Certainly that. But what I'm here on is on the qualified immunity. And this Court certainly has jurisdiction on the interlocutory appeal over qualified immunity. Not if it's, not if the determination by the District Court is on the basis of fact. If it's a disputed issue of fact, I mean, we don't have jurisdiction. Which is kind of a wash, but in any event, I mean, I just don't see how you can, what is the basis of qualified immunity here? What is the clearly established right here? Well, the clearly established right is, number one, in order for the DA Rodriguez to qualify for, or to be protected by qualified immunity, obviously and not be subject to personal liability, is they have got to show, the appellee had to show, that there was, number one, a violation of a constitutional right, their free speech, and also show that the law was clearly established at the time of the termination. And why are you saying it was not clearly established? I mean, it is clearly established, is it not, that you cannot fire somebody who has no policymaking authority and who has political involvement that was not offensive to the one who prevailed in the election, right? In general, that is true, however, the record demonstrates that each of these seven fall on the spectrum, on the side towards the employer, because they were all either policy makers or they occupied confidential positions. They say they didn't. Well, I understand there is certainly, they also say that they did, and when we look at the job descriptions, for example, for the HIDTA commander and for the first assistant, they both in their affidavits say that attached is a copy of my job description, and Dora Munoz in particular, the commander of HIDTA, says that job description accurately describes my responsibilities. When you look at that job description, she had very broad authority and sweeping discretion. Okay, now that's one. Now, are you making the same contention with respect to all of them? Well, in descending order, Your Honor, yes. The number two, Mr. Chris Yates, he was the second in command of HIDTA, and if you look at his job responsibilities, which, again, are not entirely dispositive, but you look at his affidavit as well, when the commander was out, which was often, he served as the commander. Again, had very, very broad responsibility and decision-making authority. The next one in line, you have Mr. Rogelio Casades. He was the, he served as the HR coordinator, CFO, and basically office manager administrator of the county. And if you look, I'm sorry, Your Honor, if you look at this court's decision . . . They were policy makers, but as I understand it, and you can tell me if I'm wrong, they've submitted evidence that would create an issue of fact, because they say, that's not right. You may have had the title, but I mean, I didn't do this, I didn't do that. And Your Honor, I would agree that they have submitted evidence that they also had some ministerial duties, but this doesn't have to be an either-or case. This can be both-and. They had both policy-making . . . If there's a reasonable doubt, who gets the benefit for purposes of qualified immunity? Well, that's the balancing test, right? And I would submit to Your Honor that the reasonable doubt lies with the employer in this case. I mean, each of these aggrieved victims are going to get their day in court, so to speak, but the question is whether or not this DA should be subjected to personal responsibility, right, for the alleged actions. And this Court has made very clear, including very recently, that if there's any sort of doubt, that it ought to fall in favor of the public official. In fact, I think it was this Court just recently, I mean, three weeks ago, in Valdez v. Anderson, number two, says that unless the law is clearly established when existing precedent has placed the statutory and constitutional question beyond debate, and this Court also said qualified immunity protects all but the plainly incompetent and intentional violators. And when we look at the law, that's not the case when it comes to DAs, particularly district attorneys who are charged with protecting the public. Of course, DAs are also charged with knowing the law, so you may have to place more weight on their misapprehension of the law. But Dora Maldonado, an administrative assistant, how could she be a confidential employee? Well, certainly she was not a policymaker, and we're not taking the position that she is, but she did occupy a confidential position because of the nature of her work in working with the forfeitures and accepting and dealing with the feds, federal law enforcement agencies in seizures and forfeitures. But she stands unique in the sense that she was there for more than seven months before she was terminated. It wasn't like the DA took office and then just fired her. She was in that position for just a little over seven months, and the reason why she was terminated is in the record. It's in that memo, because she was so disruptive that she caused another valued employee to be terminated, I mean to quit. And so the HR director that had replaced Mr. Casades wrote a letter, wrote her up and recommended discipline up to termination. So that's why she was terminated seven months later. Does she admit that she was that sort of employee? Does she admit that she was responsible for another employee quitting her jobs because she was so unpleasant? Your Honor, her def... Is that a sure fact? Or does it matter? I don't know. Yeah. I mean, with respect to her, I don't think it matters. And certainly of the seven plaintiffs, she is the one that would be lowest in that totem pole of, lowest in the spectrum of, in that McGee balancing test. Why would these two criminal investigators, Salazar and Leal, be confidential? How many investigate... Are all the criminal investigators confidential employees, according to Mr. Rodriguez? Yes, Your Honor, and I think the record is there were a total of seven. These two, and I don't know if there were seven when he was first hired. The record says that at the time he was deposed, I believe he had seven. And that's where I, that's why I started this argument with the context in which, in which the DA was, was elected. Shortly before he was elected, there were two criminal investigators that had been charged and convicted with criminal misconduct in connection with a unit called the Panama Unit, the Panama Unit Scandal, and this is in the record. And those two criminal investigators were heading, were part of a narcotics unit that ended up working with cartel, stealing, I mean, busting drugs and then reselling them. And that particular Panama Unit Scandal resulted in multiple civil lawsuits being filed against Hidalgo County and against the elected officials. And many of the criminal cases that were pending had to be dismissed, those that had been because of the Panama Unit Scandal. And so the DA is coming in with this mandate to restore public trust in law enforcement and he wants to be sure that the criminal investigators that are going to be representing him and representing the office and representing the county are those he can trust and have confidence in. This court, and by the way, this court is, in 1995, in the Gannica decision, said that it was okay for a district attorney to fire a criminal investigator simply because he said he was going to be, he announced that he was going to run against the sheriff. And so it was important, this court found, that good working relationships, it's important for the DA to have good working relationships. And so qualified immunity applied in that case to criminal investigators. So from a public, from a real standpoint, you have a new DA coming into office and trying to get a leadership team together. And what is the law that he sees? He sees that this circuit in 2008 and in 1995 allowed a DA to terminate or not reappoint criminal investigators and doesn't see any case law that suggests otherwise. The other thing, Your Honor, is that, is that we have Mr. Casades. Mr. Casades is the one who, again, the titles don't matter by themselves, but when we look at the facts, he was not just regarded as the CFO and the office manager and human resource manager of the office. He had broad responsibilities and the evidence shows that when we got into office, he, um, they found that he was, he didn't get fired right away, they gave him a month. And during that month, they found that he was extremely disorganized. They found evidence, he was in charge of the evidence, they found evidence scattered all over the place, including marijuana, including photographs of naked children that had been just laying around for a long time. They found checks, negotiable instruments, just laying around. And so the DA said, this is not somebody who I can trust because he's going to get my office in trouble. Did he, did the individual whom you are charging with this particular conduct admit it or is that a disputed issue of fact? Because he said, no, that is not the way I conducted the office. None of these seven were deposed, Your Honor, before the motion for summary judgment was filed. My recollection is in his affidavit, however, he does dispute that he was a bad employer, that he was disorganized or that he mishandled any evidence. Yes, sir. But wasn't the principal affiant on behalf of the plaintiffs, the former DA? Actually he was. He certainly was. And my point about that is Mr. Rene Guerra, who is the former DA who got soundly beat by DA Rodriguez, he came forward with this affidavit basically denying everything. But his testimony is largely irrelevant because it doesn't, in other words, he came forward and said, well, it's not true. None of these people did I consider close confidence. None of these people did I rely on for creating and implementing policy. None of these people, I did it all by myself. That's what the DA says, the old DA. But that's largely irrelevant because what matters is what this DA was going to do and who he wanted to have in his leadership team and who he wanted to be in his inner circle. He was going to regard the Caceres position as one of his key positions. Certainly the commander of HIDA, High Intensity Drug Trafficking Area Task Force, and the second in command to be part of his inner circle and his criminal investigators. And so what Mr. Guerra had to say and how he had a working relationship with those people is largely irrelevant, I believe, to this analysis. And so in . . . Your red light's on. Oh, I'm so sorry. Thank you, Your Honor.  I just noticed it myself. You have time for rebuttal. All right, Ms. Harris. Good morning. May it please the Court. Let me ask you a question relating to qualified immunity. It's clear that the right at issue must be clearly established. So what is the constitutional right here that was violated that would have been clear to the district attorney? As Judge Crane explained in his opinion, the law was clearly established by at least 1995 when Bodevich . . . I have a hard time with that person. Bodevich as well. Bodevich, thank you. I don't know. I could be wrong, but . . . When Bodevich was handed down by this Court, that was 1995. There's a case . . . Okay, but what is the law? It says that governmental employees shall not be fired because of their political affiliation or their political support of another candidate unless what they did . . . Unless. . . . disrupted the office. Then there are like seven or eight tests or balancing . . . tests for balancing the rights of these people. So how is a district attorney coming in to know what is clearly established when all of it is a disputed issue of fact and you've got a matter of balancing? One person can balance differently from the other. So how is the district attorney ever to know what is clearly established and what he can do and what he can't do? What is clearly . . . It's all a matter of judgment. What is clearly established is they cannot be fired for their political activity . . . Right. . . . unless there is evidence of disruption of the operations as a result of their political activity. That is a burden that is on Mr. Rodriguez, and he absolutely failed to introduce any evidence for that. Well, I'm not sure what the evidentiary burden is in the Pickering balancing test because I believe in the Connick case, I think the Supreme Court said it can be the potential for disruption also. What do you do about the Gnocca case? The Gnocca case, that was decided in 1995, and in that case, this court said, yes, the plaintiffs alleged . . . These were deputy . . . Investigators.  In the DA's office. And the court said, yes, they did pass the first prong of the test and that they alleged that their constitutional rights were violated, but the law was not clearly established at that time that investigators in DA's offices were protected. Well, that fact was established in that case. This court said they alleged a violation of their constitutional rights, therefore they established the first prong. So there's notice. Criminal investigators in DA's offices are protected by the First Amendment. You know, but that's not necessarily true. I mean, it is not without exceptions, I should say. I mean, there would be investigators in which it would be so close and so personally related to the district attorney that he may well be a confidential attorney. You don't just . . . I'm sorry. I mean, you can't just categorize them by titles. I mean . . . No, but that is the broad right. And then, of course, you do look at the individuals, Your Honor, yes. And there's absolutely no evidence in this case of that being that kind of close personal relationship. There's no evidence of any disruption. There's no evidence. Counsel asked the court to take judicial notice of facts that are not even in evidence. Mr. Rodriguez never said he fired any of these people because he feared that they would cause disruption. Mr. Villegas, when he was testifying, said that, no, they hadn't caused any disruption. No, the person who was staying until March, no, there was no evidence that he was going to cause disruption. Well, let me just ask you . . . I mean, if the purpose of . . . if what he says is accurate about the way in which the office functions, you have this high intensity drug task force, and surely the DA has to have total confidence in the people who are running that operation. And if he does . . . I mean, he went in there to drain the swamp, so to speak. And if part of this had to do with corruption, doesn't he have to . . . quite often, the theory is that that starts with a tone at the top, and you have to show that you're in charge, and there's not that tone anymore. That might be in some hypothetical case, Your Honor, but that is not what this particular record shows. He did not testify that he was trying to drain the swamp. He did not testify that there were problems with any employees or any criminal misconduct that he had to clean house. Dora Munoz, he gave no explanation. He just said he wanted his own person in it, period, and it was his right, just like when he'd been elected judge, he could pick his own coordinator, or he could pick his own employees. And he used that excuse over and over again. He just had the right to pick his own employees. Judge Sotomayor. Well, if he only fired approximately fifteen out of a hundred fifty, and only seven of them filed suit, that's not a large change in the composition of the department, is it? Dora Munoz. Record reference, page forty-three. I think it's maybe the first page of their motion to dismiss or alternatively answer. The defendants say there were two lawyers who lost their jobs and these seven plaintiffs in all those several months. So that's it. One of the lawyers was Mike Garcia, and he actually had been a supporter of Mr. Rodriguez, so he got his job back right away. All seven people who were not lawyers are our clients. And is there anything in the record about the fact that these seven were the only ones in the office who had supported Mr. Guerra as opposed to Rodriguez? No. That is not our burden of proof. No, I'm just wondering. There's Mr. Schreiber who testified. Actually, Mr. Rodriguez said that he didn't know that Mr. Schreiber had supported Guerra, but Mr. Gates knew. Why do we believe Mr. Rodriguez that he didn't know who Mr. Schreiber supported? That's a question of credibility for the jury. And Schreiber, too, is a lawyer, and I know this Court has held that lawyers are put in a separate category. You see, none of these people are lawyers. I wanted to go back and also answer, you know, a couple of questions that you presented to counsel, if I may. How many fired have answered that question? Mr. Rodriguez never said that he fired only the ones in his inner circle. That is nowhere in the record. In fact, he disclaims responsibility and even knowledge of why four people were terminated. He attributes all of that to Delgado, and he doesn't know why Delgado made that decision. So he's just in the shape of, I don't know. And I don't know is not a good enough answer. Well, excuse me, but if he . . . I mean, that is an answer vis-à-vis improper motivation. It is an answer, and the jury could find that Mr. Rodriguez is innocent. But he can't say that he fired these people because they were in the inner circle. That is not what he said, contrary to counsel's representation. He said something different from that. And so, you know, the evidence is what this Court has to go on, not arguments of counsel, of course. I mean, that's a basic principle. As to Sally Maldonado, she was the administrative assistant, and we see that, in fact, she didn't cause any disruption. In fact, she stayed until August because she was working on a very important project. As soon as she got that done, she was out of there. As Judge Crane says, you know, she was no longer essential, but she didn't do anything disruptive. She got her work done. In fact, one of the allegations in this letter that she never even heard about until discovery in this case was that people were talking loudly near where she sits to work, and she says, people are trying to work here. She demonstrates the work ethic. She wants to get her work done. She doesn't want these people chatting, interrupting her. I mean, Sally is like, she almost puts on blinders when she goes to work because she is so focused on getting her work done. And one of the other criticisms was just amazing. She took off the nameplate from the door of a person who had moved out and put on the nameplate of a person who was moving in, and she was criticized for that, which makes no sense. It makes no sense to do that. What does that have to do with this case? That has to do with our offer of proof of causation and pretext that their articulated other reason, you know, their . . . you can't call it non-discriminatory, but they say reason other than political affiliation is pretextual. So, I mean, that's the question of fact. I just thought it was important to point out, as Judge Crane did, that they can't have it both ways. They can't say, this is why we did it, and then argue that they have some kind of fear of potential disruption. There is no evidence in the record in which Mr. Rodriguez says he feared these seven people would cause disruption, and there's no evidence that they did either. Well, again, I don't think that the evidence of disruption is the most important thing, and in fact, in the Gnocca case, they do say the fellow was not an employee for ADEA purposes, although he was a criminal investigator in the DA's office in El Paso, because he had to consult with the DA very frequently on very sensitive matters. And as to that saying that it's a clearly established interest, what is clearly established is by January 1992, a public employer cannot act against an employee because of his support of a rival candidate unless the employee's activities in some way adversely affect the government's ability to provide services. Now, is that a question of fact or a question of law? Right now it's a question of fact because there's no evidence in the record that any of my clients did anything disruptive. There's no evidence in the record that anyone feared that my clients, these seven human beings, did anything disruptive or that they feared that they would. Well, it's not just disruptive. You're talking about pickering in a way, or conic, but this is branty, and it says in some way adversely affects the government's ability to provide services. And, you know, you've got the head of the task force, and why doesn't that person have to be very closely aligned with the DA? And that's why we thought it very important to put in the record evidence of exactly what Dora Munoz's, the limits of her authority and discretion, because she doesn't set the policy for what the Haida task force does. That's set by the federal government. She's just the head of that unit, and so she carries out what they're supposed to do. She reports directly to the district attorney. If you had an organizational task force, an organizational chart of the DA's office, wouldn't she be one of the department heads, just like the head of HR? Well, it's interesting, because they offered us an organizational chart, and they didn't even have her on there. But again, the law is not where they sit, you know, in relation to the decision maker. It's what they do. Is there evidence that their job requires political affiliation with the newly affected official? And there is no evidence in the record. In fact, they deny it. The defendants deny that their political affiliation had anything to do with it. Mr. Rodriguez said, no, nobody has to be a supporter of me in order to work here. Mr. Vieques said political allegiance to Mr. Rodriguez is not required for any of those positions. Mr. Fuentes, who ultimately took over Ms. Munoz's position, he said the same thing. Political loyalty to Mr. Rodriguez is not required. And Mr. Rodriguez said that. Judge Crane pointed that out. That was a very important thought to him. Judge Crane's opinion, I think it's like 35 pages, and he very carefully goes through the arguments and the evidence and points out the inconsistencies in the defendant's testimony, but he also points out the lack of evidence. I mean, this reference to the Panama unit, that some unit went rogue, Judge Crane was very familiar with that, and he took note of the law that says just because somebody has engaged in political support of your opponent doesn't mean you can just automatically assume that they're going to be poor performers, which is what the Supreme Court said in LROD 2. You can't make these assumptions. And to the extent that there was any speculation that there might be problems, it was the same kind of sabotage or bad performance that any employee would do. Just come back to Gnocca for a second, because after referring to Branty and Vovedich both and having described the duties of this criminal investigator at great length, the Court says that the right he asserts which was not clearly established at the time as far as violated it because neither the Fifth Circuit nor the Supreme Court had addressed the issue of political patronage in the hiring or firing of investigators in DA's offices. And they give immunity here, and I don't see that as a holding that it's unconstitutional to fire a criminal investigator. Well, I would point you on to the page before that where looking at the first prong, I guess it's page 474 of the opinion, or 473, 474, the Court observes Gnocca alleged in his complaint that his discharge and failure to be rehired by Defendant Jaime Esparza was motivated by reasons of plaintiff's political preferences. Thus, Gnocca has at least alleged a violation of his constitutional rights. So that's where we learn that it is a violation of the rights of an investigator to fire him for his political support. We learn in Gnocca, a case right on point . . . Well, I'll never use that phraseology again then, referring to the allegations of a complaint and have someone come back at me 20 years later and say, of course I won't be here 20 years from now, but someone come in 20 years . . . Allegation means that it's a violation. A violation. But it says, I mean, it says, has at least alleged. Well, I mean, you can allege anything. That's all I'm saying. Gnocca could have alleged that he was fired for being right-handed, and you could say, you know . . . But what the Court was answering here were the two prongs. Okay, I'll do . . . So it got past the first prong. It was a violation of his constitutional rights. I'll read it more carefully. And then we went to the next question, which is whether it was clearly established. The Court says, we must first determine whether Gnocca has alleged a violation of his constitutional right, citing, well, Vojticevic for one, citing Elrod, and the Court then concludes, thus Gnocca has at least alleged a violation of his constitutional rights. So they're answering it in the affirmative, that he passed the first prong, and that's why the Court went to the second prong. If this were to go to the jury, what questions would the jury be asked? The jury would be asked the question of causation. If they . . . Who would answer the question, which you say is disputed, as to whether . . . I mean, we'd have to do this for each plaintiff, but who would answer the question, the Court or the jury, as to whether each plaintiff was a confidential or an employee as to whom political loyalty was necessary? There are sometimes occasions when that question has to be presented to the jury because the evidence is so conflicting. Most of the time . . . I'm sorry. Most of the time the question is a matter of law for the Court, but it's also recognized that occasionally a jury needs to get involved. All right. Then let me just follow up. Wouldn't you agree under Bose v. Consumers Union that if the facts had been laid out, that this Court would have the ability to review that? That jury question? Yes. My understanding is . . . Yes, sufficiency of the evidence, certainly. I mean, you always have that jurisdiction. Well, I think we have more plenary review in First Amendment cases. Yes, but you'd have to look at the evidence the jury considered and see whether it's supported by the record and whether ultimately it will be. We don't know yet, but we're anxious to find out. Yes. Okay. Thank you. Okay, Mr. Thomas, you have rebuttal. I have to say, I read Judge Crane's opinion, and it is one of the most detailed opinions on this subject that I have ever seen, and seems to highlight a number of inconsistencies in the evidence with regard to the motivation and the . . . Of course, in the district court, your client didn't concede he had filed . . . that he was aware of these people's political involvement, but I think reasonably you don't argue that on appeal. So, what do you do about all these factual problems? Well, thank you, Your Honor, and again, we are not asking this court to reweigh the factual determinations that Judge Crane preliminarily made, but I do have two concerns with Judge Crane's opinion that I think this court absolutely has jurisdiction on and should correct. Number one is that the law was not clearly established with regard to the criminal . . . Well, in fact, I take it back. He says the law was clearly established the opposite way with regard to the criminal investigators, and based on this court's 1995 decision in Gonnica and then reaffirmed in 2008 in this court's decision, James v. Mullen, I think the criminal investigators' DA clearly has authority to let them go when he needs their political allegiance and their trust and their confidence. With regard to the Haida commander and the second-in-command and the intelligence analyst who had top-secret clearance, the law is not so clearly established and there is no analogous precedent with regard to them. So, I think Judge Crane got both of those wrong. The other issue I have with Judge Crane's opinion, and I hope this court will correct it, is that just like opposing counsel, he focuses on the Volvo v. Lopez decision, and his interpretation of this court's decision is problematical because he seems to suggest that there must be evidence only of actual disruption and seems to ignore the long precedent going back to the Supreme Court's decision, U.S. Supreme Court's decision in Connick, and reaffirmed by this court multiple times that potential for disruption falls in that balancing test for in favor of qualified immunity. And when counsel says there was no evidence of this disruption, I would like to give a couple of citations to the record for the court. For example, when I said that Casades, the HR guy and the CFO, that he left marijuana laying around and photos of naked children and money and that the DA was worried that this was going to hurt the office, the court can find that at the record on appeal, page 1389 through 1392. When we talk about the Panama Unit scandal, that that was fresh on the table. Well, again, I mean, you admitted that the man who is accused of this misconduct denies it, right? So it's one person's word against another. I mean, is there some kind of evidence that you have that is so clearly convincing that it makes out the person who is being charged with this conduct just to be telling falsehoods? Yes, Your Honor, and I believe that that goes to— your concern goes to whether this court has jurisdiction in their— whether or not the county or Ricardo Rodriguez in his official capacity can have liability. But with regard to his personal liability or qualified immunity would protect him, I believe that the record is absolutely clear that either the law was established, clearly established that he could terminate the criminal investigators, or the law is not so clearly established that he couldn't terminate the HIDTA commander and the second-in-command and the intelligence analyst with that top-secret clearance. And just the very fact that we are—I want to quote from Justice Jones's, in my view, wise dissent in Valdez v. Anderson 1, debatable constitutional violations demand a qualified immunity for public officials even when this court is bound to find that a violation occurred. And since we're having this debate and that courts and advocates continue to struggle with this delicate balance, with all due respect, requires reversal of the trial court's order with respect to dismiss— and a dismissal of the claims against D.A. Rodriguez in his individual capacity based on qualified immunity. Okay. I wanted to ask you, you said these people are going to get their day in court. Yes, Your Honor. Irrespective of what we—even if we rule in your favor, they're going to get their day in court. What did you mean by that? What I mean by that is, I presume—I mean, there's still other things that need to happen, discovery, depositions, and things like that. But I presume they're going to have their day in court against Hidalgo County and against the D.A. in his official capacity. What I'm asking this court to do is eliminate the D.A.'s personal liability based on qualified immunity, which should protect him. Obviously. That's the only thing before us now. But this case today does not resolve the totality of the case that these seven people have. They also have a suit in the official capacity against the district attorney and against the county as well. That's correct, Your Honor. All right, sir. Thank you both very much. Thank you.